IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:13CR038 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | GOVERNMENT'S |
| | ) | SENTENCING MEMORANDUM |
| RICHARD SCHMIDT, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through counsel, Steven M. Dettelbach, United States Attorney, and Assistant U.S. Attorney Duncan T. Brown and respectfully files its sentencing memorandum.

The defendant pled guilty to two violations of 18 U.S.C. § 922(g), being a felon in possession of a firearm, 18 U.S.C. § § 931(a) and 924(a)(7), being a felon in possession of body armor, and one violation of 18 U.S.C. § 2320(a)(1) and (b)(1), trafficking in counterfeit goods. For the reasons listed in part below, and to be further amplified at the sentencing hearing scheduled for November 26, 2013, the Government respectfully requests that the Court sentence the defendant at the high end of the Sentencing Guidelines for each count; that the Court run the

sentences for the firearms and body armor concurrent with each other and that term of incarceration consecutive to the term of incarceration for the trafficking in counterfeit goods; and that the Court vary upward in its sentencing for the trafficking in counterfeit goods count to reflect the seriousness of the offense.

## I. Offense Level Calculations

### A. Base Offense Level for Count 1

The Government asserts that the Base Offense Level for Count 1 was corrected in the second Pre-Sentence Report (PSR) and correctly represents the actual offense conduct. The defendant pled guilty in Court to being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1). The Pre-Sentence Report correctly applies United States Sentencing Guideline § 2K2.1, and now adds an additional two levels for one of the firearms being stolen.

#### 1. There should be a two level upward adjustment for a stolen firearm.

According to agents, one of the shotguns recovered by agents from the defendant was reported stolen. As Application Note 8 (B) of U.S.S.G. 2K2.1 states, in sum and substance, "Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe the firearm was stolen." In the instant case, the firearm was, in fact stolen, and was recovered in the possession of the defendant. Therefore, he should be assessed a two level upward adjustment under U.S.S.G. § 2K2.1.(b)(4)(A).

According to an interview of Christine Parry performed in May of 2013 by Toledo Police Detective Louie Espinosa, while living in Ottawa County in 2010 she and her fiancé had a storage locker with numerous items including a Mossberg 12 gauge S/N R842037. They eventually moved to Wisconsin and, while unpacking, realized they were missing some items. The shotgun

was one of the items missing. Since they were living in Wisconsin they did not file a police report. Upon reflection, Ms. Parry believes that the only time that the items could have been taken was when her fiancé Richard Schnee was at the locker working on an all-terrain vehicle (ATV). The ATV had a flat tire so he drove it to the gas station to fill up the tire. While he was gone he left the door to the storage locker open.

The defendant will likely argue that a lack of police report limits the ability of this gun to be considered stolen under the Sentencing Guidelines, this belief, however, is belied by case law. In addition to United States v. Bates, 584 F.3d 1105 (8th Cir., 2009) which supports the theory that U.S.S.G. § 2K2.1(b)(4) should be applied whether or not the defendant knew the firearm was stolen, United States v. Sanchez, 507 F.3d 532 (7th Cir., 2007) and United States v. Ingram, 194 Fed.Appx. 558, 2006WL2578809 (10th Cir., 2006), both hold that because the standard of proof at sentencing is lower than that at trial, victim statements that report a firearm stolen, but omit serial numbers or descriptions, provide a sufficient basis for the guideline application, therefore, it is the fact that a firearm was stolen and ended up in a felon's possession, not the completeness of police paperwork that is the subject of the enhancement. Thus, based on the detailed description provided to Detective Espinosa, this adjustment is appropriate.

**2. There should be a four level adjustment for a firearm possessed in connection with another felony offense.**

The Government submits that when the defendant was arrested he had in his possession a loaded .45 caliber semi-automatic handgun. The firearm was in his coat pocket and the defendant, his coat, and the firearm were in the Spindletop Sports Zone, a store engaged in the sale and trafficking of counterfeit goods. Per the defendant's plea of guilty in this case to the offenses

for possession of, and trafficking in, counterfeit goods, federal felony offenses, a four level upward adjustment pursuant to U.S.S.G. § 2K2.1(b)(6)(B) is proper.

The Government argues that this adjustment is relevant because the firearm was possessed while the defendant was openly engaged in business with the general public. While the Government might concede that a business that has a firearm locked in a safe in a backroom not accessible to the general public arguably could be exempt from this adjustment, such facts are far from present in this case. The defendant possessed the firearm in a coat that was on a chair near the front of the store and accessible to any person in the store. More importantly, it was available and accessible to the defendant as he was actively engaged in the sale of counterfeit goods.

The application note for this subsection does not require a scenario where the use of the firearm is explicitly set forth, as in a case where a defendant brandishes a firearm during a robbery or use of a firearm during a drug deal, rather it requires merely the *potential* of the firearm facilitating or being used in the commission of another offense. That potential certainly existed here; in a retail setting it is not unimaginable that a person would argue about the legitimacy or quality of the defendant's counterfeit goods and that argument escalating; in that scenario his ready access to a firearm would certainly warrant the four level adjustment. Likewise, given the violent and vitriolic writings found in the possession of the defendant in the store, his house, his storage locker, and elsewhere, it is all too easy to create the potential for his use of the firearm found in his coat during the trafficking of the counterfeit goods.

The theory supporting the Government's argument is well-supported and embraced by case law as well. As the second PSR correctly pointed out, the possession of a firearm by the defendant in this case involving trafficking in counterfeit goods is conceptually no different than if

he were trafficking in narcotics. While the defendant will likely argue that "in connection with another felony offense" must require the firearm to be brandished or actually used to complete the other felony, such an interpretation ignores actual precedent. United States v. Davis, 372 Fed.Appx. 628, 629 (6th Cir., 2010)(showing the nexus between the firearm and the other felony is "not a particularly onerous burden"). The Sixth Circuit has upheld the application of the additional four levels as provided in the Guidelines when the firearm was used to protect an illegal business, United States v. McWhorter, 445 Fed.Appx. 835 (6th Cir., 2011); United States v. Rogers, 594 F.3d 517 (6th Cir., 2010), or as part of the "fortress theory" that possession of the firearm emboldens the defendant, even if it is not brandished or otherwise used. United States v. Shields, 664 F.3d 1040 (6th Cir., 2011); United States v. Taylor, 648 F.3d 417 (6th Cir., 2011); United States v. Bullock, 526 F.3d 312 (6th Cir., 2008).

**3. The defendant was not a collector of firearms and is not entitled to a reduction.**

The defendant is seeking a reduction in his Offense Level claiming to be a collector. Case law requires this determination to be driven by the facts surrounding the number of firearms, type of firearm, amount and type of ammunition, the location and circumstance under which the firearms were found, and how the firearms were used. United States v. Skeens, 589 F.Supp.2d 757, 758 (W.D. Virginia, 2008); *citing* U.S.S.G. § 2K2.1(b)(2)(2008). Faced with the burden of proof by a preponderance of evidence that he is entitled to relief, the facts of this case do not support his claim. In the instant case the defendant possessed 18 firearms, other courts have held that felons in possession of even six handguns are not entitled to a reduction for having a collection. United States v. Gonzales, 12 F.3d 298 (1st Cir., 1993).

Specifically, the defendant cannot satisfy even a single element that would classify his arsenal as a collection.[1] Of the eighteen firearms the defendant had eight rifles, at least seven of which could accept high capacity magazines. Of note, the defendant had two AR-15 style rifles, the AR stands for Armalite Rifles, the company that purchased the rights to the M-16 rifle for civilian production, it fires the same .223 caliber round as the military M-16 and M-4 rifle, but is not fully automatic. The Armalite AR-10 has a similar platform as the AR-15, but fires a .308 round, this round is heavier than the .223 and has greater penetration and stopping power, the defendant had a second .308 as well. Also in the defendant's possession was a Remington M700, traditionally this rifle has been preferred in the military for its use as a sniper rifle. The defendant also possessed an Eagle Arms 5.56 caliber rifle, this rifle fires a 5.56x45 caliber round which is similar in size to the .223, but is more commonly used by NATO troops.

Likewise he was in possession of multiple shotguns commonly used in tactical situations, one even compatible with four drum barrels. While a drum barrel is used in urban warfare situations, it has no practical recreational use; indeed, most states limit shotguns to a three round capacity, well-below the 25-round capability of a drum. Likewise the defendant possessed six hand guns ranging in caliber from 9 millimeter to 45 caliber to .357 magnum. All of the firearms were semi-automatic, except for the .357, and he possessed multiple magazines for each ranging in capacity from 8 to 12 rounds. 9mm semi-automatic pistols are favored by many police forces, .45s are the sidearm of choice for most military in combat situations, and the .357 magnum was popularized in the Dirty Harry movies.

Thus, none of the firearms he possessed were for hunting or purely recreational purposes, whether they were too tactical or high capacity for hunting purposes like the shotguns, or too

1 Photographs of the firearms, ammunition and room will be presented at the hearing.

powerful a round for hunting like the rifles (with exception of the .22) the defendant cannot claim a legitimate recreational purpose for owning these firearms. Likewise, the collection does not have a unique historical or collectible value. None of the firearms are especially unique or rare, nor are they identified as collectible firearms usually are -- by commemorative engraving or certification.

Skeens further distances the defendant from the reduction because of the amount of ammunition found. The defendant had over 40,000 rounds of ammunition, some of it hollow point. The average brick of handgun or rifle ammunition sold to the public is 20 to 25 rounds, thus the sheer amount of ammunition is staggering. The defendant had most of his ammunition labeled and organized for easy access. Likewise he had large quantities of every type of ammunition. This was not an amount of ammunition that was amassed for one or a few trips to the range, this was a stockpile.

Likewise, the location of the firearms suggests this was more than a mere collection. While the defendant had three pistols at home and one in his jacket, the rest, along with most of the ammunition, were stored in a private room in the mall he not only controlled, but created. The defendant had specially built a room at the back of an empty store in the mall his store was in. This room contained nothing but his rifles, ammunition, body armor, his writings, and a cot. The room was not open to the public and only he had access to it; it was in no means a museum or even a room he used to entertain gun or hunting enthusiasts, it was, for want of a better term, his lair.

Even more telling that this was no simple collection was the fact that he had secreted parts and pieces of firearms in a number of trailers he kept in the parking lot of the mall. These trailers

were filled with gas canisters, gun parts, and other supplies he felt he would need once he started carrying out his written plans.

**4. By now claiming he is a collector the defendant is not fully accepting responsibility and his sentence should properly reflect the seriousness of the offense.**

The Government argues that although the defendant pled guilty instead of going to trial, this is not adequate acceptance of responsibility. At his suppression hearing he offered incredible testimony of a female who denied having a romantic relationship with him despite recordings proving otherwise. Furthermore, his claim that his firearms were possessed merely as a collection is a gross and ludicrous misstatement of his true intentions. Not only does it ignore the totality of the circumstances under which they were found, but the defendant has not accepted responsibility for trafficking in counterfeit goods. So focused on his firearms the defendant neglects to mention his trafficking business, the original reason for the search of his business in the first place.

Moreover, considering that the felony that prohibited him from owning firearms was because he shot and killed one individual and shot two others while they tried to run away, for him to claim he was a simple collector is an affront to the idea of acceptance. The defendant was convicted for using a firearm against three other people, there can be no sincere belief that he did not know even "collecting" firearms was prohibited after he used firearms to take a life.

## II. The Defendant's Trafficking in Counterfeit Goods Should Be Considered a Separate Offense and the Sentence for that Conviction Should Run Consecutively, Not Concurrently to the Firearm and Body Armor Sentences.

Pursuant to the Sentencing Guidelines, the Court has the discretion to run sentences consecutive to each other, or concurrently. The Government respectfully asks the Court to run the sentence for trafficking in counterfeit goods consecutive to the sentences for possession of a

firearm and body armor to reflect the seriousness of this offense, and its primacy in underwriting the defendant's other activities.

As the PSR states, the defendant relied on Spindletop Sports as his sole source of income, his immediate and extended families were deceased and he has little or no savings. Quite simply, but for his trafficking in counterfeit goods the defendant would not have been able to purchase any firearms, let alone the stockpile of weapons and ammunition, and related items. Indeed, based on the contents of his four trailers, the secret room at the mall, and in his house, it appears that the defendant spent money on little else but firearms, ammunition, and items he believed he needed to carry out his plans. It should be stated explicitly that based on his writings, these plans were to assassinate members of religious and cultural groups based only on their race, religion and ethnicity and to broadcast those murders to like-minded supporters.

To carry out these plans he amassed the weapons and ammunition recovered by law enforcement during their raids for counterfeit goods, but he also used his store's proceeds to buy gasoline, body armor, knives, gun parts, upgrades for his vehicles, and, not least importantly, a separate area in the mall in which to secrete these items.

While the defendant may argue that because the counterfeit goods were sold to purchase weapons the sentences should run concurrently because they are the same transaction, to do so would minimize the seriousness of the use of proceeds from the counterfeit trafficking. The cost of an average used AR-15 is between $1,000 and $1,500, likewise, most .308 rifles sell for about the same. Ammunition for high caliber rifles is more than that for handguns, although a box of 9 mm ammunition is approximately $15. When these approximations for firearms and ammunition are extrapolated for the amounts the defendant possessed, the investment he made is,

conservatively, $8,000 for the firearms ($500 on average for each of the firearms) and $24,000 for the ammunition alone. Without adding in the value of the gun parts, knives, body armor and other errata recovered the value for the guns and ammunition, alone, is $32,000. The value alone speaks to the singularity of his plan and the extent to which he was willing to pay to see it carried out.

Thus, the Government argues that because the proceeds for trafficking in counterfeit goods is so determinative to the success of his plan to murder religious and cultural leaders, the penalty for it should reflect the seriousness of what those proceeds were underwriting.

## III. The Court Should Vary Upward the Defendant's Sentence to Reflect the Serious Nature of the Offense.

18 U.S.C. 3553(a) allows for variance above the range set by the Sentencing Guidelines based on a determination that considers a) the nature and circumstances of the offense; b) the history and characteristics of the defendant; c) the need for a sentence imposed; and d) the kinds of sentences available. In the instant case, the defendant is at the 10 year maximum for the firearm offenses, while 18 U.S.C. § 2320 provides for a sentence up to 20 years. When the 3553(a) factors are fully considered, the Government argues that this case warrants an upward departure.

### A. The Circumstances of This Case are More Serious than the Guideline Calculation

As stated above, the Government argues that this case is not a mere possession case, nor is it a simple trafficking case. This defendant, who was convicted for killing one person and shooting two others as they fled, was arrested with an arsenal of weapons and ammunition and hitlists. This defendant had a National Alliance card in his possession and his writings made clear that he shared the views of this group in no uncertain terms. This defendant spent tens of

thousands of dollars stockpiling weapons, ammunition, and other gear that he believed he needed to carry out his murders.

This defendant, quite simply, was a well-funded, well-armed, and focused one-man army of racial and religious hate.

**B. The Defendant Has a History of Violence**

The Government argues that the defendant's record, although consisting of only one conviction, is more than enough to demonstrate his danger to the community. The defendant's prior conviction is for the use of a firearm against three others, one mortally. This conviction and the current offenses do not exist in a vacuum; the very nature of his writings suggest that the sole purpose he had in amassing his firearms and ammunition was to carry out similar acts of violence, but on a much larger scale. What was discovered in the second store in the mall was a well-organized, well-stocked magazine. He was not a haphazard sportsman with ammunition only for the next hunt; he purchased high-capacity rifles, high-powered ammunition, and even body armor to protect himself from what he expected once he started executing his plan. By his association with the National Alliance and the Vinlander Social Club, a white power club in whose name he registered one of his trailers, it is clear that the defendant has not distanced himself from his violent past, if anything he used the proceeds from his business to further fund his violent goals.

**C. A Long Sentence Is Necessary to Prevent this Defendant From Committing Additional Crimes**

The defendant spent thirteen years of his life in prison for killing one person and shooting two others. He willingly traded his honorable discharge from the military and partial college education for the opportunity to pose with firearms he thought would be used in a race war he

hoped to start. This defendant has exhibited the potential to be a productive member of society, he has been given the opportunity to rejoin society and be a productive member of it. In return he took those opportunities and continued to collect weapons and plot out his hate-filled schemes. This defendant has not demonstrated any ability or desire to live a law abiding life, rather, he has demonstrated the repeated desire to engage in acts of racially-motivated violence.

**D. 18 U.S.C. § 2320 Allows for Sentences Up to 20 Years**

The Court has a wide variety of options, given the facts articulated above, and anticipated to be developed further on November 26, the Government respectfully requests the Court to vary upward. The Offense Level for the counterfeiting charge is 22, roughly 46-57 months. This equates to roughly six years less for the sentence he is facing for the firearms, firearms he would not have been able to purchase but for the trafficking in counterfeit goods. The Government is not asking for a full upward variance to 20 years, however, it is asking for an upward variance that reflects the relationship between the defendant's trafficking in counterfeit goods and his being able to bankroll his illegally owned arsenal.

## IV. Conclusion

Based on the fact that the defendant possessed a stolen firearm and possessed a firearm in connection with the commission of another felony offense, the Government respectfully requests that an additional six levels be added to his Adjusted Base Offense Level for Count 1, making the new total a Level 32. Moreover, based on the nature of the offenses, the defendant's violent criminal history, and the compelling evidence that his intentions were to use the firearms in a manner consistent with his writings and prior actions, the Government respectfully requests sentences not only at the top of the guideline ranges for Counts 1, 2, 3 and 4, but that the sentences

for the firearm offenses run consecutively to the counterfeit sentence, and that the sentences for his convictions be varied upward to reflect the seriousness of the offenses.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By: /s/ Duncan T. Brown
Duncan T. Brown
Assistant U.S. Attorney
Reg. Nos. 3982931 (NY)
400 United States Courthouse
801 West Superior Avenue
Cleveland, Ohio 44113
Telephone Nos.: (216) 622-3933
Facsimile No.: (216) 685-2378
E-Mail: duncan.brown@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November, 2013, a copy of the foregoing Government's Sentencing Memorandum was sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's System.

/s/ Duncan T. Brown
Duncan T. Brown
Assistant U.S. Attorney