**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 3:13CR038 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE JACK ZOUHARY |
| -vs- | : | |
| | : | |
| RICHARD SCHMIDT, | : | **DEFENDANT RICHARD SCHMIDT'S** |
| | : | **SENTENCING MEMORANDUM** |
| Defendant. | : | |

Defendant Richard Schmidt, through undersigned counsel, submits the instant

Sentencing Memorandum for the Court's consideration and requests a sentence, as calculated and

reviewed pursuant to Title 18, United States Code §§ 3553(a) and 3661, that is sufficient but not

greater than necessary to achieve the statutory goals of sentencing.

Respectfully submitted,

*/s/Edward G. Bryan*
EDWARD G. BRYAN (0055556)
Assistant Federal Public Defender
Office of the Federal Public Defender
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
Telephone: (216) 522-4856; Fax: (216) 522-4321
Email address: edward_bryan@fd.org

## MEMORANDUM

A.    *Introduction*

The case against Richard Schmidt was initiated by a Criminal Complaint filed on December 21, 2012, alleging a violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm. On January 16, 2013, a federal grand jury returned a four count indictment against Mr. Schmidt. Count 1 alleged that on December 21, 2012, Mr. Schmidt was a felon in possession of five firearms in violation of 18 U.S.C. § 922(g)(1) .  Count 2 alleged that on December 28, 2012, Mr. Schmidt was a felon in possession of fifteen firearms in violation of  18 U.S.C. § 922(g)(1).  Count 3 alleged that on December 28, 2012, Mr. Schmidt was a felon in possession of body armor in violation of 18 U.S.C. § 931(a).  Count 4 alleged that from September 30, 2011 through December 21, 2012, Mr. Schmidt trafficked in counterfeit goods in violation of 18 U.S.C. § 2320(a)(1).  On July 9, 2013, Mr. Schmidt entered a conditional guilty plea to the charges in the indictment, reserving his right to appeal the Court's earlier denial of his Motion to Suppress.  There were no other agreements by the parties.

B.    *Procedural Sentencing Framework*

In Kimbrough v. United States, 128 S.Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in United States v. Booker, which requires district courts to consider the advisory Guidelines, but also permits district courts to tailor a sentence in light of the other statutory concerns set forth in 18 U.S.C. § 3553(a).  Under the statutory concerns set forth in § 3553(a), district courts are directed to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation by imposing

2

a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  Kimbrough, 128 S.Ct. at 570; 18 U.S.C. § 3553(a).  This "parsimony provision" is "an overarching provision," representing a cap above which a district court is statutorily prohibited from sentencing – even when a greater sentence is recommended by the Sentencing Guidelines, which, per § 3553(a), are statutorily subordinate to the parsimony principle.  See Kimbrough, 128 S.Ct. at 570.

Thus, after properly calculating the advisory range under the Sentencing Guidelines, a factor which serves as only the "starting point" or "initial benchmark," district courts must then consider each of the § 3553(a) factors to impose a sentence sufficient, but not greater than necessary to fulfill the purposes of sentencing.  Gall v. United States, 128 S.Ct. 586, 596-97 (2007).  The Supreme Court explained district courts may not presume the Guidelines range to be reasonable. Gall, 128 S.Ct. at 596.  Further, the advisory Guidelines range is to be given no greater weight than any other § 3553(a) factor.  Gall, 128 S.Ct. at 594, 596-97, 602.  The Supreme Court has rejected an appellate rule requiring extraordinary circumstances or the use of a mathematical formula to justify a sentence outside the Guidelines range.  Gall, 128 S.Ct. at 595.  Instead, appellate courts will apply the abuse of discretion standard of review to all sentencing appeals whether a district court imposed a sentence within or outside of the Guidelines range.  Id. at 596.  In order to facilitate this review, the district court "must adequately explain the chosen sentence . . . to promote the perception of fair sentencing."  Id. at 597.  The justification must be "sufficiently compelling to support the degree of the variance."  Id. at 598.

District courts are afforded sentencing discretion because it is the district courts who are "in a superior position to find facts and judge their import under § 3553(a) in the individual case.

The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." Gall, 128 S.Ct. at 598. To this end, "when a party raises a specific, non-frivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he [or she] accepts or rejects the party's position." Rita v. United States, 127 S.Ct. 2456, 2468 (2007). Mr. Schmidt now presents the following for the Court's consideration relative to the factors outlined in § 3553(a).

**C.**    ***Application of 18 U.S.C. § 3553(a)'s Sentencing Factors***

    **1.**    ***Nature and Circumstances of the Offense and History and Characteristics of Mr. Schmidt***

        **A.**    ***Nature and Circumstances of the Offense***

Mr. Schmidt became a target of a Department of Homeland Security (DHS) investigation in September of 2011 when agents from DHS searched a package mailed to Mr. Schmidt from China. A search of the package revealed it contained multiple National Football League jerseys that were of extremely poor quality. Over the next few months, DHS agents continued to intercept packages intended for Mr. Schmidt that were being sent from overseas. Based upon an examination of the contents of the packages, DHS agents believed Mr. Schmidt was receiving counterfeit merchandise from overseas to be resold in the United States.

Between the months of April and December 2012, law enforcement agents conducted surveillance of Mr. Schmidt at his place of business and at his home. Agents observed Mr. Schmidt receive numerous boxes from shippers and also observed Mr. Schmidt taking these packages to and from his home and his place of business, Spindletop Sports Zone, located in the Woodland Mall in Bowling Green, Ohio. The agents also reviewed merchandise for sale at Mr. Schmidt's store. The

review of some of the merchandise revealed, according to agents, licensed products that did not appear to possess the necessary holographs indicating the merchandise was properly licensed for sale.

On December 21, 2012, FBI agents executed search warrants at Mr. Schmidt's business, his home, and numerous trailers and vehicles under Mr. Schmidt's control.  In addition to counterfeit merchandise, agents also located a large number of firearms and large quantities of ammunition. One firearm was located in a coat pocket, hung over a chair in a backroom of Mr. Schmidt's store. The room was not accessible to the public.  Mr. Schmidt was in his store when the search warrants were executed.

On December 28, 2012, agents conducted another search on a location within the Woodland Mall.  The area was a room where it was believed Mr. Schmidt stored additional items. Among items seized from this location were additional firearms and ammunition.  Also located during this search was body armor.  A detailed inventory of items seized during the search of Mr. Schmidt's properties is contained in the Pre-sentence Investigation Report (PSR).

In addition to counterfeit merchandise,  firearms, ammunition and body armor, there was also  myriad other items stored in the places searched.  The items appeared to stored to be used in case of an emergency or natural disaster.   Included among the items were 80 wool army blankets, over 100 army coat inserts, boxes of pine cones, cut up wood pallets and cardboard.  There was also over 60 cans of gasoline and 7 cans of kerosene.  There was also over 4000 sand bags, a generator, shop lights, and a chainsaw.  Mr. Schmidt also had a supply of firewood even though he did not have a fireplace, or wood burner in his home.

During the latter search, there was also located over 30 containers of freeze dried food, over 1500 containers of canned food, over 20 bags of rice, stacks of bottled water, and over 75 cans of ensure.  Mr. Schmidt also had multiple containers of vitamins and supplements, multiple tubes of toothpaste, a box of tooth brushes, and glassware for drinking.  Mr. Schmidt also stored over 30 cans of dog food.  The food has since been donated to a local food bank.  The sand bags were donated to a local fire department to be used for flood control.

During the search of Mr. Schmidt's properties, agents also located and seized and noted myriad writings, documents and tapes.  The government asserts some of these writings are relevant to the instant case.  In fact, Mr. Schmidt possessed numerous other materials and writings that were collected and prepared by him over a period of many years, including 13 years he spent in prison on a manslaughter conviction.  Mr. Schmidt studied extensively 501(c)(3) tax exempt organizations, including numerous African American and Jewish organizations.  Included among the writings were addresses and contact information for various leaders of these organizations.  Mr. Schmidt also had lists that included names, addresses and telephone numbers for colleges and universities, energy companies, and local, state and federal agencies.

Although Mr. Schmidt saved writings and research materials on environmentalism and world-wide economic and political systems, the government agents' primary focus was on materials they claimed demonstrated Mr. Schmidt's interest, and perhaps membership in, white supremacy movements.  Included in items seized from Mr. Schmidt was a National Alliance card and a VHS tape from the 2005 National Socialist Movement meeting.  There was also a document, apparently written by Mr. Schmidt, titled "The Vinland Gruppe."  The document included an organizational description and mission statement.  The document stated that the group's purpose was to "bring

6

together the finest of the European community to form a uniform political and economic voting bloc." See PSR ¶ 61. "The Vinland Gruppe" was written will Mr. Schmidt was in prison around the year 2000. It was part of a project that was for a college course he was taking at the time.

Of particular interest to the government was the fact that Mr. Schmidt had contact information for Jason Upthegrove, the NAACP chapter leader for Lima, Ohio and Dr. Wendell Anthony head of the Detroit, Michigan chapter of the the NAACP. Located on the page that contained Mr. Upthegrove's information was a list titled "General" with seven items referencing numerous African American and Jewish organizations. Six items were also listed on this document: 1) a gun camera, 2) silencer, 3)Bicycle infiltration, 4) Rally to safe location with WIFI and no cameras-Download video, 5)Send video to e-mail contacts–move to safe location, 15 minutes/location, and 6) Send video to cell phone contacts–to be forwarded to end recipients. There were also directions to N. Elizabeth Street in Lima, Ohio. See PSR ¶ 65-66. Among the same documents that the above information was located was a document wherein it was stated, "no illegal activities."

Notwithstanding the volume of material noted and seized from Mr. Schmidt's properties, none of the items listed above were found. There was no gun camera seized. There were no silencers seized from Mr. Schmidt's property, and none of the firearms seized from Mr. Schmidt were threaded for a silencer. Mr. Schmidt denies that he intended to cause harm to anyone, including those listed in written materials found within his property. Mr. Schmidt learned about Jason Upthegrove when he made statements in the media against the Lima Ohio Police Department following the shooting and killing of a mother holding a child during a drug raid. See PSR ¶ 70. The incident where the Lima police department shot and killed the young mother occurred on January

7

8, 2008, almost five years before Mr. Schmidt's arrest in the instant matter. <u>See</u>

http://www.nytimes.com/2008/01/30/us/30lima.html?_r=0 .

### b.      *History and Characteristics of Mr. Schmidt*

Mr. Schmidt was born on August 8, 1965 to Kathryn Schmidt in Bloomington, Indiana. Mr. Schmidt did not reside in Indiana but was born there as his mother traveled through Indiana. Mr. Schmidt's mother was an antiques dealer who traveled the country.  Mr. Schmidt was raised primarily by his maternal grandparents, Lester and Cleo Hanna.  He did not have a relationship with his father, who has since passed away.  Furthermore, Mr. Schmidt's grandfather passed away in 1976 and his grandmother died in 1982.  Mr. Schmidt's mother passed away on November 19, 1995, while Mr. Schmidt was in prison.  Mr. Schmidt has no siblings, or other relatives.

Mr. Schmidt graduated from Toledo Central Catholic High School in 1983.  Mr. Schmidt joined the Army in 1985 and was honorably discharged from active duty in 1989.  Mr. Schmidt remained in the active Army Reserve until his arrest in August of 1989 for Voluntary Manslaughter.

On August 21, 1989 at 2:19 in the morning, Mr. Schmidt and a friend were involved in an altercation with five individuals in another vehicle shortly after leaving a bar.  According to reports, the individuals in the other vehicle started yelling insults at Alex Daudelin, who was driving the car.  Mr. Schmidt was a passenger.  After the two vehicles pulled over, one of the individuals in the other car approached Mr. Schmidt with a baseball bat.  According to Mr. Schmidt, he warned the individual against assaulting him and his friend.  Mr. Schmidt claimed the individual swung the baseball bat and Mr. Schmidt shot him in self-defense.  Another individual was shot when he too attacked Mr. Schmidt with a baseball bat; and the third individual was struck by a bullet that ricocheted off the ground.

8

Mr. Schmidt originally faced murder and felonious assault charges. Mr. Schmidt defended himself against the charges based upon a claim of self-defense. Ultimately, Mr. Schmidt agreed to a plea deal where he pled guilty to Manslaughter with a Firearm Specification and Felonious Assault. Mr. Schmidt was sentenced to an indefinite sentence of 10 to 25 years incarceration on the Manslaughter conviction and a period of 3 years consecutive for the Firearms Specification. For the Felonious Assault conviction, Mr. Schmidt was sentenced to an indefinite sentence of 8 to 15 years concurrent with the 13 to 25 year sentence he was serving for the Manslaughter with Firearms Specification.

While in prison, Mr. Schmidt availed himself of all opportunities to improve himself. He enrolled in college courses offered by various universities including, the University of Findlay, Wilmington College and The Ohio State University. Mr. Schmidt also attended the University of Toledo after his release from prison and studied International Relations and Nonprofit Management.

Mr. Schmidt was paroled from prison in 2003 after serving the minimum 13 year term. Because of his conviction, Mr. Schmidt had a difficult time securing employment so he became self-employed as a vendor at flea markets, fairs and festivals. He also worked for a two year period as a bouncer at a Toledo bar. Eventually, Mr. Schmidt was able to open his own business, the previously mentioned, Spindle Top Sports Zone, where he was working at the time of his arrest in the instant matter.

**2.** ***Need for Sentence Imposed to Reflect Seriousness of Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, Protect the Public from Further Crimes, and Provide Mr. Schmidt with Needed Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner***

If this Court sustains objections that Mr. Schmidt raises herein to the Sentencing Guideline calculations in the Final Pre-Sentence Investigation Report, Mr. Schmidt submits that a sentence at the low end of the previously computed Sentencing Guideline range found in the First Disclosure to the Pre-Sentence Investigation Report will be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from future crimes, and provide Mr. Schmidt with needed rehabilitation.  The First Disclosure to Mr. Schmidt's Pre-Sentence Investigation Report determined Mr. Schmidt's Sentencing Guideline range to be 63 to 78 months.

However, the government objected to the First Disclosure's calculations and the Probation Department agreed with the government's objections.  Accordingly, the Final Disclosure to the Pre-Sentence Investigation Report determined Mr. Schmidt's Sentencing Guideline range to be 97 to 121 months.  Mr. Schmidt submits any sentence within that range will be far greater than necessary to accomplish the above goals of sentencing.

**3.** ***The Kinds of Sentences Available***

Under 18 U.S.C. § 924(a)(2), the statutory punishment for a violation of 18 U.S.C. § 922(g), Counts 1 and 2, is not more than 10 years of imprisonment.  The maximum term of imprisonment for Count 3 is 3 years pursuant to 18 U.S.C. § 931(a) and 923(a)(7).  The maximum term of incarceration for Count 4 is 10 years pursuant to 18 U.S.C. § 2320(a)(1) and 2320(b)(1).

**4.** ***The Kinds of Sentence and the Sentence Range Established for the Offense Under the Advisory Sentencing Guidelines***

***a. The Federal Sentencing Guideline Calculations***

Pursuant to the United States Sentencing Guidelines grouping rules, the Probation Department grouped the first three counts of the indictment together in a single sentencing guideline. Counts 1 and 2 are convictions for Felon in Possession of a Firearm and Count 3 is for a conviction of Felon in Possession of Body Armor. Count 4, Trafficking in Counterfeit Goods, is grouped as a separate offense under the United States Federal Sentencing Guidelines.

The applicable Sentencing Guideline for the first three counts is USSG § 2K2.1. Pursuant to USSG § 2K2.1(a)(3) the base offense level for the firearms and body armor offenses is 22 because Mr. Schmidt has one prior offense of violence and at least one of the firearms he possessed is described in 26 U.S.C. § 5945(a). Mr. Schmidt's offense level is increased by 4 levels pursuant to USSG § 2K2.1(b)(B) because he possessed 19 firearms.

The Probation Department next increases Mr. Schmidt's offense level by 2 levels pursuant to USSG § 2K2.1(b)(4)(A) because the government alleges one of the firearms possessed by Mr. Schmidt was stolen. Mr. Schmidt objects to this enhancement because the evidence is insufficient to prove by the weight of the evidence the firearm was stolen. This enhancement was added after the government objected to the first disclosure to the Pre-Sentence Report because it failed to include this enhancement. Paragraph 28 of the PSR still states, "[a]ccording to the case agent, none of the firearms were stolen." Notwithstanding this fact, the government now claims that Task Force Officer Espinosa conducted an interview of a the last registered purchaser of a Mossberg 12 guage shotgun possessed by Mr. Schmidt. According to TFO Espinosa, he telephonically interviewed a

11

Christine Parry, the last registered purchaser of the shotgun.  Parry claims that she had a storage locker when she lived in Ottawa County Ohio.  She claimed she moved to Wisconsin and when she was unpacking she noticed that items were missing, including the shotgun.  She claimed that they failed to file a police report to report the shotgun stolen because they were now living in another state.  She speculated the shotgun and other items were taken from the storage locker on an occasion when her boyfriend was at the locker working on an ATV.  She claimed her boyfriend left the locker for a period of time to fill a tire with air and he left the locker door open.

Mr. Schmidt claims he purchased the shotgun, as he did most of the firearms he possessed, from a flea market.  He had no knowledge the firearm was stolen.  While Mr. Schmidt acknowledges the law does not require his knowledge of the stolen status of the shotgun at the time he possessed it to receive the enhancement, he disputes that the government has met its burden that the shotgun was in fact stolen.  There was no record that the shotgun was stolen, even when the previous owner noticed it was missing after she moved to Wisconsin.  It is likely she did not report the shotgun stolen because she did not consider it stolen.  In fact, even the previous owner is speculating that the firearm was stolen.  It is easy to make such a claim when the firearm is located among the possessions of a person charged with federal firearms offenses.  Ultimately, hearsay testimony from the TFO officer who interviewed the previous owner should not be sufficient to establish the 2 level enhancement.  If the government desires to carry its burden of proving the stolen firearm enhancement it should be required to call the previous owner as a witness so she may be subjected to the scrutiny of cross examination regarding her story, especially in light of the fact that she never reported the firearm stolen until contacted years later by a federal task force officer.

12

The Probation Department next increases Mr. Schmidt's offense level by 4 levels pursuant to USSG § 2K2.1(b)(6)(B), alleging at least one of the firearms was possessed "in connection with" another felony offense; that is, Mr. Schmidt's trafficking in counterfeit goods.  Again, this enhancement was not included in the First Disclosure to the Pre-Sentence Investigation Report, but added after the government objected to its absence.  The government's claim is based upon the fact that a single firearm was located in a jacket pocket in a back room of Mr. Schmidt's store where he sold, among other items, the counterfeit merchandise to which he pled guilty.  Mr. Schmidt denies that he used the firearm to facilitate the illegal activity of selling counterfeit merchandise.  Instead, the firearm was possessed in the same manner that most merchants possess firearms, to protect their stores against robbery, or other criminal activity.  Mr. Schmidt denies that the sole purpose of his business was to sell counterfeit merchandise.  In fact, the vast majority of Mr. Schmidt's business was selling legitimate items.  Only recently, a couple merchants in the same mall in which Mr. Schmidt's store was located were robbed.  He carried the firearm to protect himself and his business from criminal activity.  Nothing about possessing the firearm furthered the criminal purpose of selling counterfeit merchandise as compared to the legitimate purpose of selling non-counterfeit merchandise.

Mr. Schmidt acknowledges that the government need not prove he brandished or otherwise used the firearm during the commission of the counterfeiting offense, but the facts in this case are clearly distinguishable from the facts in the cases cited by the government.  The sale of narcotics is clearly distinguishable from the circumstances in this case.  It is not alleged that Mr. Schmidt's entire business was a criminal enterprise, only the sale of certain merchandise was prohibited.  Clearly the possession of a firearm by a narcotics trafficker certainly emboldens him or

13

her in her endeavor to sell drugs far beyond Mr. Schmidt's possession in the instant case. The trafficker is only protecting an illegitimate enterprise. Mr. Schmidt was protecting a legitimate business, only a small portion of which involved the sale of items in violation of the law because the items were counterfeit. Furthermore, Mr. Schmidt's case is distinguishable from a person who possessed counterfeit currency at the same time he possessed an illegal firearm. See United States v. McWhorter, 445 Fed Appx. 835 (6th Cir. 2011). There is no legitimacy to using a firearm to protect counterfeit currency. In fact, the mere possession and use of counterfeit currency, depending on the circumstances, could create a scenario wherein the possessor may feel the need to use the firearm. There is nothing about Mr. Schmidt's offense conduct of selling counter merchandise along-side legitimate merchandise that is similar to possessing a firearm during a ***wholly*** criminal enterprise such as selling narcotics and possessing, using and selling counterfeit currency.

Because of the unique nature of the instant case, there are no cases on point. However, the spirit of the enhancement and the rationale for upholding the enhancement in other scenarios is not present in the instant case. The commentary notes to USSG § 2K2.1(b)(6) state the "in connection with" another felony offense enhancement should apply if the firearm facilitated, or had the potential of facilitating, the other felony offense. Mr. Schmidt's general possession of a firearm in a back room of his business did not facilitate, or have the potential of facilitating, the sale of the counterfeit merchandise separate and apart, or in addition to, the firearm's potential to be used to defend himself and his legitimate business interests generally. The instant scenario is simply not the same as the possession of a firearm during the commission of a wholly illegitimate enterprise such as drug trafficking or possessing and selling counterfeit currency.

14

Based upon the addition of the 6 levels to Mr. Schmidt's offense conduct, which was based on the government's objections to the First Disclosure to the Pre-Sentence Investigation Report, the Probation Department scored Mr. Schmidt's Offense Level for the firearms offenses to be 32. Mr. Schmidt submits that the appropriate Offense Level for the firearms offenses should be 26.

The base offense level for Trafficking in Counterfeit Goods is 8 pursuant to USSG § 2B5.3(a).   Eight (8) levels are added pursuant to USSG § 2B5.3(b)(1) because the infringement amount exceeded $70,000.00 but was less than $120,000.00.  Pursuant to USSG § 2B5.3(b)(2), 2 levels are added because the offense involved the display and distribution of work prepared for commercial distribution.  Because the infringed items were imported, 2 additional levels are added pursuant to USSG § 2B5.3(b)(3) .  The Probation also increased the offense level by 2 levels pursuant to USSG § 2B5.3(b)(5) because a firearm was possessed in connection with the sale of counterfeit merchandise.[1]

Based upon all of the enhancements, Mr. Schmidt's offense level for the Counterfeit Goods conviction is level 22.

---

[1]For the reasons that Mr. Schmidt objects to the 4 level enhancement applied by the Probation Department to the Firearms guideline range, Mr. Schmidt objects to the 2 level enhancement being applied to the Counterfeit Goods guideline range.  For the same reasons the firearm was not possessed *in connection with* the counterfeit goods for purposes of increasing the Firearms guideline, the firearm was not possessed *in connection with* the counterfeit goods for purposes of Counterfeit Goods guideline.

Pursuant to the multiple counting adjustment, Mr. Schmidt scores one unit for the multiple counts in the case because the final offense level for the Firearms guideline is greater than 9 levels higher than the Counterfeit Goods guideline, level 32 compared to level 22.[2]

The Probation Department scored the greater of the adjusted offense levels to be 32. The Probation Department grants Mr. Schmidt a total of 3 levels off for acceptance of responsibility. Accordingly, Mr. Schmidt's Total Offense Level is scored at 29. At a Total Offense Level of 29 and Criminal History Category of II Mr. Schmidt faces a Sentencing Guideline range of 97 to 121 months. Based upon the above objections, Mr. Schmidt submits his Total Offense Level should be 25; and with a Criminal History Category of II, his Sentencing Guideline range should be 63 to 78 months.[3]

---

[2]In the First Disclosure to the Pre-Sentence Investigation Report, the Probation Department calculated the Firearms Guideline to be 26 and the Counterfeit Goods guideline to be 22. Pursuant to the multiple counting adjustment, Mr. Schmidt scored 2 units rather than 1 because the guideline ranges for the two offenses were within 9 levels of each other. Accordingly, Mr. Schmidt's Adjusted Offense Level was 28 with the 2 level enhancement applied because he had 2 units under the multiple count adjustment. Accordingly, the net difference between the Final Offense Level in the First Disclosure Report compared to the Final Offense Level in the Final Disclosure to the Pre-Sentence Report is 4 levels (29 compared to 25), even though Mr. Schmidt objects to a total of 6 levels of enhancements under the Firearms Guideline. If the Court sustains Mr. Schmidt's objections, the Adjusted Offense Levels for the Firearms convictions and the Counterfeit Goods convictions will be within 9 levels of each other and 2 units would be properly scored under the multiple counting provisions of the guidelines. Accordingly, the net difference between the First and Second Disclosures that Mr. Schmidt objects to is 4 levels.

[3]Again, even though Mr. Schmidt objects to a total of 6 levels of enhancements, the net difference is 4 because the multiple count adjustment does not apply because of the larger variance between final offense levels between the two groups of offenses. See footnote 2.

### b. Acceptance of Responsibilty

Mr. Schmidt is *not* seeking a reduction in his Offense Level by claiming to be a "collector" of firearms.   Pursuant to USSG § 2K2.1(b)(2) a defendant, ***not subject to subsection (a)(1), (a)(2), (a)(3), (a)(4), and (a)(5),*** may seek a reduction to Offense Level 6 if the firearm(s) and/or ammunition that were possessed were solely for lawful sporting purposes, or a ***collection***. The government went to great lengths in its Sentencing Memorandum to demonstrate why Mr. Schmidt is not entitled to receive a reduction for being a collector of firearms.  Simply stated, Mr. Schmidt is not pursuing this reduction because he is not entitled to it.  He is not entitled to seek the reduction because he is subject to subsection (a)(3) of 2K2.1 because his previous felony conviction is for a crime of violence and he possessed at least one firearm mentioned in 26 U.S.C. § 5945(a).

The government asserts Mr. Schmidt is seeking the "collector" reduction because he stated in his statement of acceptance of responsibility that he possessed the firearms and ammunition because he is a "collector."  However, Mr. Schmidt's use of the term "collector" in this context is not the same as the use of the term pursuant to  USSG § 2K2.1(b)(2) .  Mr. Schmidt went on to acknowledge that he was aware that he could not legally possess firearms because of his prior felony conviction and acknowledged the wrongfulness of his actions.

The government next seizes on Mr. Schmidt's "collector" comment to argue that he has not fully accepted responsibility for his criminal conduct.  The government's argument is disingenuous.  The government is fully aware Mr. Schmidt is not attempting to claim he possessed the firearms and ammunition he did in the same manner that the "collector" reduction found in USSG § 2K2.1(b)(2) anticipates.  Mr. Schmidt was merely stating that he had no specific plans for the use of the firearms and ammunition that he "collected."  Furthermore, the government falsely

17

argues, "[t]he defendant was convicted for using a firearm against three other people, there can be no sincere belief that he did not know even "collecting" firearms was prohibited after he used firearms to take a life." Govt. Sent. Mem. p. 8. Mr. Schmidt makes no such statement in the Pre-Sentence Report. In fact, he expressly admits he knew he was not permitted to possess firearms because of his felony conviction. PSR ¶ 32. The government also argues Mr. Schmidt failed to admit to his commission of the counterfeit goods count. Mr. Schmidt did, in fact, plead guilty to the offense and the failure of an admission in the Pre-Sentence Report regarding this count is an oversight. Mr. Schmidt has admitted he committed all four counts to which he pled guilty and will continue to do so at his upcoming sentencing hearing.

Ultimately, the government's arguments regarding Mr. Schmidt's Acceptance of Responsibility are totally without merit. It seems the government will not be satisfied with Mr. Schmidt's admissions regarding his possession of firearm and ammunition unless he admits and adheres to the ludicrous idea promoted by the government in its Sentencing Memorandum that Mr. Schmidt possessed firearms and ammunition to spark a "race war." Mr. Schmidt will not make a false admission to satisfy the government. He has fully accepted responsibility for the offense conduct to which he has pled guilty and any argument to the contrary is plainly without merit.

### c.     Mr. Schmidt should not receive a separate sentence for the Counterfeit Goods conviction to run consecutive to Mr. Schmidt's firearms sentence.

The government argues this Court has discretion under the Sentencing Guidelines to run Mr. Schmidt's sentences for the Firearms and Counterfeit Goods convictions consecutively. The Court's discretion, however, is not unlimited. A district court's discretion in sentencing on multiple counts of conviction is governed by USSG §5G1.2. USSG §5G1.2(a) states, [e]xcept as provided

in subsection (e)[4], the sentence to be imposed on a count for which the statute (1) specifies a term of imprisonment to be imposed; and (2) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment, shall be determined by that statute and imposed independently.  Subsection (b) of USSG §5G1.2 states: [f]or all counts not covered by subsection (a), the court shall determine the total punishment and shall impose that total punishment on each such count, except to the extent otherwise required by law.  Mr. Schmidt submits that the "total punishment" is the one arrived at by careful application of the Federal Sentencing Guidelines, which has been accomplished in the instant matter by figuring the individual sentencing guidelines for grouped offenses and applying the multiple count adjustments to arrive at the "total punishment."

The additional subsections of  USSG §5G1.2 provide further guidance.  Subsection (c) states:" [i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentence on all counts ***shall run concurrently***, except to the extent otherwise required by law."  Mr. Schmidt submits that since both sentencing ranges for the first and final disclosures to the Pre-Sentence Report (63-78 and 97 to 121)[5] are within the highest statutory maximum sentence of 10 years, the firearms and counterfeit goods sentences must run concurrently pursuant to USSG §5G1.2(c).  This is further supported by reading subsection (d). Subsection (d) states: "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the ***total punishment*** , then the sentence imposed on one or more of the other

---

[4]Subsection (e) does not apply in the instant matter because it addresses sentences pursuant to the Career Offender guideline and those imposed pursuant to a conviction of 18 U.S.C. § 924(c), neither of which are applicable in the instant matter.

[5]Mr. Schmidt acknowledges that the high end of the latter range is one month longer than the statutory maximum sentence, but the difference is *de minimus* in the grand scheme of things.

counts shall run consecutively, ***but only to the extent necessary to produce a combined sentence equal to the total punishment***.  In other respects, sentences on all counts shall run ***concurrently***, except to the extent otherwise required by law."  Again, Mr. Schmidt submits the "total punishment" is the one arrived at by proper application of the Federal Sentencing Guidelines.  The above subsections make clear that the Court must impose a concurrent sentence, and may only impose a consecutive sentence to the extent the guideline range on multiple counts exceeds the highest statutory penalty, and only to the extent the total guideline punishment exceeds the statutory maximum sentence on the highest statutory penalty.

In many ways the above application of USSG §5G1.2. moots the government's argument why Mr. Schmidt's counterfeit goods conviction should run consecutive to his firearms convictions.  However, it is important to address the government's argument to run Mr. Schmidt's counterfeit goods sentence consecutive to his firearms sentence in as much as it may factor in this Court's determination whether or not the government's argument constitutes aggravated circumstances at sentencing.

The government asserts Mr. Schmidt's primary goal in selling counterfeit goods was "underwriting" his other illegal activities.  What the government fails to acknowledge is that Mr. Schmidt had been in the community nearly a decade before his arrest on the instant charges and he was employed the entire time.  Mr. Schmidt began his work history following incarceration by selling merchandise at various flee markets, fairs and festivals.  He also worked over two years as a bouncer to help support himself.  Eventually, and relatively recently before his arrest, Mr. Schmidt was able to establish his business at the Woodland Mall.

20

Mr. Schmidt was also engaged in the selling of much more untainted merchandise than he ever sold of counterfeit merchandise.  The government argues, based upon its selective interpretation of some of Mr. Schmidt's materials and writings, that Mr. Schmidt's "plans were to assassinate members of religious and cultural groups based only on their race, religion and ethnicity and to broadcast those murders to like-minded supporters." Gvt. Sent. Mem. p. 9.  Mr. Schmidt vehemently denies these allegations.  The documents from which the government postulates its theories were written several years before Mr. Schmidt's arrest.  None of the items the government claims Mr. Schmidt intended to use in these supposed plans were recovered from Mr. Schmidt's property.  There were no "gun cameras" found.  There were no silencers discovered. Notwithstanding the fact that Mr. Schmidt had myriad firearms, none of the firearms were threaded to accept a silencer.

Furthermore, Mr. Schmidt does ***not*** and will ***not*** argue, as suggested by the government, that the sale of counterfeit goods should run concurrent with his possession of firearms precisely because the counterfeit goods sales helped him purchase the firearms so they are the same transaction. Gvt. Sent. Mem. p. 9.   Mr. Schmidt was released from prison in 2003.  Since that time, he has been employed in multiple legitimate endeavors and he began purchasing many items, in addition to those items he was prohibited by law from possessing.  Mr. Schmidt does not admit that every firearm obtained by him was purchased with proceeds from counterfeit goods sales.  In fact, the vast majority of income accumulated by Mr. Schmidt since his release from prison, and the goods acquired by such income, has been through legitimate, law-abiding endeavors.  Simply stated, there is not an adequate nexus between counterfeit goods sold and the unlawful purchase of firearms and

21

ammunition to support the government's argument that the former supported the latter; so therefore, the two sentences should run consecutively.

> ### d.   *An upward variance is not warranted to reflect the serious nature of the offense.*

The government asserts Mr. Schmidt should be punished more severely than the firearms guidelines provide because the circumstances surrounding his possession of firearms and ammunition suggest that Mr. Schmidt had more sinister motives behind his possession of firearms and ammunition than simply possessing them.  Specifically, the government asserts Mr. Schmidt intended to use the weapons to target specific individuals for assassination and to promote an all out "race war."  The government's assertions are a false narrative spun from a creative, yet selective, interpretation of items seized at the time of Mr. Schmidt's arrest.  An objective view of all of the evidence, and not just "cherry picked" evidence, demonstrates Mr. Schmidt's possession of the firearms and ammunition to be far less sinister than what the government asserts.

Mr. Schmidt did not have just a large supply of firearms and ammunition.  He had a large supply of just about everything needed to survive a catastrophe.  Dozens of wool army blankets, inserts for coats, stored fuel for vehicles and enough food and water to keep Mr. Schmidt and others fed for an extended period of time.  Notwithstanding the fact that Mr. Schmidt had materials about various African American and Jewish organizations, and members of such organizations, he had reams of materials about other topics, including the environment, potential environmental catastrophes, world-wide economic and political systems, and writings and materials about the vulnerabilities of such systems and their chances of collapse.

Although there is evidence Mr. Schmidt studied the white supremacy movement and had materials from white supremacy groups, Mr. Schmidt had information regarding other fringe groups as well.  Furthermore, it is clear that much of the information was dated.  The National Socialist Movement VHS video located in Mr. Schmidt's property was from a meeting in 2005.  The information concerning Lima, Ohio NAACP leader Jason Upthegrove was acquired by Mr. Schmidt when Mr. Upthegrove was featured heavily in media accounts following  the terrible tragedy in Lima, Ohio when a young mother holding her child was shot and killed by Lima police during a drug raid.  This incident occurred on January 8, 2008, almost five years prior to Mr. Schmidt's arrest.  Counsel admits that some of the information seized by authorities from Mr. Schmidt seems troubling, but when objectively viewed in its proper context almost all of the information was dated and none of it had been acted upon.

Furthermore, the government asserts Mr. Schmidt's prior conviction for Manslaughter demonstrates he is prone to incite a race war.  Mr. Schmidt's conviction is over twenty-four (24) years old.  Mr. Schmidt was release from prison after serving the minimum time permissible.  He remained out of prison for nearly 10 years without any contact  with law enforcement before his arrest in the instant matter.  Simply stated, there is nothing about Mr. Schmidt's 24 year old conviction that suggests he is primed to engage in the amount and type of violence alleged by the government in its Sentencing Memorandum.

The government is attempting to inflame passions with over-the-top assertions based upon its selective interpretation of Mr. Schmidt's materials.  In reality, the government seeks an enhanced sentence for Mr. Schmidt based upon its belief that Mr. Schmidt possesses outrageous, hate-filled beliefs.  While Mr. Schmidt does not concede the government's interpretation of his thoughts and

beliefs, he does assert that the freedom embodied in the First Amendment prohibits the government for punishing Mr. Schmidt more harshly simply because of his beliefs, whatever they may be.  In Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993), the Supreme Court stated: "[a] defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration."  The First Amendment protects thoughts, regardless of their content: "Content-based regulations [of ideas] are presumptively invalid."  R.A.V. v. City of St. Paul, Minn. 505 U.S. 377, 382 (1992)(striking down "hate speech" ordinance as facially unconstitutional for prohibiting otherwise permitted speech solely on the basis of the speech's subject.).

Mr. Schmidt acknowledges that where discriminatory thoughts cause violence, the First Amendment does not afford protection.  See Mitchell, 508 U.S. 487-88.  To ensure that a defendant is not being punished for thoughts alone, a defendant's alleged discriminatory thoughts must be the factual cause of physical violence.  In the instant matter, to enhance Mr. Schmidt's sentence upward based upon his beliefs, the government must prove that Mr. Schmidt acted, or took an affirmative step toward acting on those beliefs by harming or attempting to harm others.  The government asserts Mr. Schmidt did so based on its selective interpretation of writings found within Mr. Schmidt's property, but it cannot prove Mr. Schmidt intended to do the things the government asserts.

In light of all of the items located in the properties controlled by Mr. Schmidt, the evidence is clear that Mr. Schmidt was storing items in anticipation of some type of complete societal collapse, and not one precipitated by actions on his part.  The sheer volume of stored survival gear, which frankly includes firearms and ammunition, lends heavy credence to Mr. Schmidt's assertions he was preparing for a "worst case scenario," a potential doomsday calamity, where governments and economies failed and people were left to fend for themselves.  Mr. Schmidt

24

was active in the on-line survivalist community.  He was a regular poster on www.survivalistboard.com.  He spent time in this forum discussing the future with like-minded individuals.  If the government bothered to review any of Mr. Schmidt's other materials and writings it would have discovered he was interested in many things that he deemed to be threats to the stability of society, including monetary policy from central banks, such as quantitative easing.  Mr. Schmidt knew he could not control what direction society took, but he was intent on being prepared for a societal collapse and to be able to protect, and provide for, himself and others.  Mr. Schmidt's motives may have been unorthodox, but they were not sinister.

> **e.**     *A downward variance is appropriate if this Court determines the proper Sentencing Guideline range for Mr. Schmidt is 97-121 months.*

If this Court determines that a 2 level enhancement is appropriate for one of the firearms being stolen and a 4 level enhancement is appropriate for the firearms being possessed "in connection with" the counterfeit goods count, Mr. Schmidt submits a downward variance is appropriate in this matter.  The basis for the variance is that both enhancements would apply in only a technical sense and not because they embody the rationale behind the enhancements.  Imposing a sentence within a 97 to 121 month range would be far "greater than necessary" to accomplish the purposes and goals of sentencing.

> **5.**     *Pertinent Policy Statements by the Sentencing Commission*

There exist no Sentencing Commission Policy Statements pertinent to this case that have not been addressed in other sections of this memorandum.

> **6.**     *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

A sentence at the first disclosure PSR calculated Guideline Sentence of 63-78 months is warranted by the circumstances in this case.  Most firearm offenders similarly situated as Mr. Schmidt  face sentencing ranges similar to the one he faces at this range.  A sentence above this range would create an unwarranted disparity between Mr. Schmidt and most firearm offenders with similar offense conduct and personal backgrounds.

> **7.**      **The Need to Provide Restitution**

Restitution is not applicable in this case.

**D.**      *Conclusion*

For all of the above-stated reasons, Mr. Schmidt respectfully requests this Honorable Court impose a sentence at the low end of the Sentencing Guideline range originally calculated by the Probation Department, 63 to 78 months.

Respectfully submitted,

*/s/ Edward G. Bryan*
EDWARD G. BRYAN (#0055556)
Assistant Federal Public Defender
Office of the Federal Public Defender
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856 Fax: (216) 522-4321
e-mail address: edward_bryan@fd.org.

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2013, a copy of the foregoing Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

*/s/ Edward G. Bryan*
EDWARD G. BRYAN (#0055556)
Assistant Federal Public Defender
